

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00485-CV

IN THE INTEREST OF L.L.F., T.L.F.,
K.D.B., II, A.A.H., AND N.C.H.,
CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

Appellant L.J. (Mother) appeals the trial court's judgment terminating her parental rights to her five children. After a bench trial, the trial court found that Mother had engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered the physical or emotional well-

---

[1]*See* Tex. R. App. P. 47.4.

being of the children and had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being.[2]   The trial court also found that Mother has a mental or emotional illness or mental deficiency that renders her unable to provide for the children's needs and that the illness or deficiency would in all reasonable probability continue to render Mother unable to provide for the children through their eighteenth birthdays.[3]   In addition, the trial court found that termination of Mother's parental rights would be in the children's best interest.   Mother challenges the legal and factual sufficiency of the evidence in four issues.   We affirm.

## II.  Background

Mother has five children.  At the time of trial in March 2011, L.L.F. was nine years old, T.L.F. was six years old, K.D.B. was five years old, A.A.H. was three years old, and N.C.H. was seventeen months old.

In August 2007, the Texas Department of Family and Protective Services (the Department) received a referral that Mother had been hospitalized after attempting to overdose on medication.   Department investigator Brandy Matthews testified that Mother "had asked her oldest child to stab her in the stomach[,] and she was currently pregnant at the time."   Mother told Matthews

---

[2]See Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2011).

[3]See id. § 161.003 (West 2008).

2

that she had taken some pills, had a knife, and had thought about stabbing herself with it, but Mother denied having asked L.L.F. to stab her. Mother also told Matthews that she had smoked marijuana three weeks earlier.

Matthews testified that L.L.F., T.L.F., and K.D.B. lived with Mother at the time of the suicide attempt. L.L.F., who was five years old at the time, told Matthews that she had seen Mother take two pills, that Mother had asked her to stab her, but that she had refused. The three children were removed and placed into foster care. A.A.H. was born in January 2008 but was not removed from Mother because the Department did not believe she was in danger since Mother was receiving services from the Department at the time.

Takeisha Lusk-Wilkerson served as Mother's caseworker for the 2007 referral. Mother's service plan included parenting classes and random drug testing, and mental health services provided by Tarrant County Mental Health/Mental Retardation (MHMR). Mother also submitted to a psychological evaluation. She was diagnosed as bipolar and as having a personality disorder. Mother participated in services through MHMR, mostly for medication management, and started taking medication after A.A.H.'s birth. Although she was in jail for three weeks in February 2008 for a bond violation relating to a previous arrest, Mother was, as of April 2008, generally doing well. She was taking psychotropic medication, avoiding aggressive and violent behaviors, and stable.

3

Gladys Demus took over as Mother's caseworker in May 2008. She testified that her main goals for Mother were for her to take her medication and to not lose her social security income. Mother's social security benefits were cut off in July 2008 because of a warrant for her arrest, and they were not reinstated until October 2008. Also in July 2008, the Department received a new referral that was called in by one of Mother's neighbors. Mother told Demus that she had ended a relationship with her neighbor's eighteen- or nineteen-year-old son, which led to a disagreement with the neighbor, and the neighbor made allegations about Mother to the Department. Mother also told Demus that she had stopped taking her medication "because it made her feel funny." Demus testified that when she spoke to Mother, Mother was struggling to complete her services and seemed to be getting overwhelmed. Demus testified that she was concerned about Mother's temper, saying that Mother was very nice and calm one moment but loud and uncontrollable another. Mother promised to resume taking her medication but did not do so, later saying that she did not need her medication.

In February 2009, the Department decided to begin a monitored return of the children to Mother, and the children began weekend visitations with Mother. Mother's case was also transferred to the Department's Strengthening Families Unit, and Schauntae Kato became Mother's caseworker. Kato described the Strengthening Families Unit as an intense program designed to work with families who are at risk for neglect of their children.

Kato testified that Mother told her that she was not taking her medication because it made her tired and unable to respond to her children the way she wanted. Mother also told Kato that she was pregnant again. Mother said she felt overwhelmed, and she reported that the children were not listening to her and that they were not on a regular schedule for meals, bedtime, or daycare. Kato offered Mother continued counseling and parenting classes. Kato also arranged for the Department to pay Mother's rent in March 2009.

Kato testified that Mother still did not have food stamps or Medicaid in February 2009, even though eighteen months had passed since the children were initially removed. The children, however, had Medicaid coverage through the Department. Mother began receiving her own Medicaid benefits in May 2009.

Kato testified that the children were doing "okay" in March 2009. They had been through quite a transition from having been away from home and then returning to Mother, and they were having some behavioral problems. L.L.F., the oldest child, was attending a school within walking distance of Mother's apartment. Kato testified that the children were properly clothed and did not appear malnourished, and she said that Mother used money from the Department to purchase furniture for the children.

Christy Stewart was Mother's Catholic Charities caseworker beginning in April 2009. Mother admitted to Stewart that she was not seeing a doctor or taking her bipolar medication, and she told Stewart that she was hearing voices

5

and had to fight them off. Mother also told Stewart on April 8 about domestic violence in her relationship with D.H.,[4] and she said that she had been putting bleach in D.H.'s food, not to kill him but to make him sick. D.H. told Stewart that the bleach allegation was "ridiculous," but Stewart contacted the Department because of what Mother had told her.

Kato testified that the children were removed from Mother for one or two nights following the report concerning the bleach. After considering the situation, including that Mother had recently been set up to begin MHMR services, the Department returned the children to Mother. Kato testified that she believed the April 2009 decision to not permanently remove the children was risky because Mother was not yet taking medication and was exhibiting concerning behavior. However, none of Mother's behavior was directed at the children, and D.H. did not believe the bleach allegation to be true.

After the children were returned to Mother, Mother told Kato that L.L.F. had written a note to a boy at school, asking if they could have sex when they grew up. Kato interviewed L.L.F., but L.L.F. did not make any sexual abuse outcry.

Kato also testified about other difficulties for Mother after the children were returned to her in April 2009. Mother would not go to the county hospital for medications. Kato spoke with Sharon Fountain of MHMR on May 27, 2009, and the hope was for MHMR to deal with Mother's mental health issues by providing

---

[4]D.H. is A.A.H. and N.C.H.'s biological father.

6

employment assistance, community support, clinical support, medication management, and respite care. But Mother had difficulty with MHMR appointments, such as acting out and not understanding when additional information was required, so Kato personally took Mother to MHMR. Kato testified that MHMR accepted Mother as a client, but only after Kato had salvaged the situation. Also, Mother's request for public housing was denied on June 1 because of her criminal history. Even so, the court renamed Mother the children's permanent managing conservator in June 2009, and Mother resumed taking her MHMR medications in July. Kato testified that Mother's case was closed in October 2009, but Kato also testified that she had ongoing concerns with Mother's medication because Mother had again stopped taking it due to her pregnancy. However, Kato acknowledged that Mother was better than she had been at the time of the 2007 referral.

Suzanne Gorry started working with Mother after N.C.H. was born in October 2009. Gorry works for the Department in its Family-Based Safety Services Unit, which monitors and provides continuing services for families. The Department initiated the continuing services because Mother tested positive for marijuana four times during her pregnancy with N.C.H. When services began, all five of Mother's children were living with Mother.

Gorry testified that Mother's primary issue was mental health, but Gorry also said that she had concerns about Mother's substance abuse and parenting

7

skills. Gorry knew Mother's history from reviewing the case file and felt that Mother was not applying what she should have learned from previous services.

In December 2009 and January 2010, the Department gave Mother $400 to pay rent for a new apartment because she had received an eviction notice. Mother, D.H., and the children were living in the apartment. They were receiving about $700 per month in social security income and food stamps. Mother told Gorry that she and D.H. had a verbal agreement with the previous apartment manager to receive six months of free rent because of a bug infestation in their apartment, but Gorry testified that the new apartment manager did not know anything about a verbal agreement. By mid-December 2009, Mother blamed Gorry for not finding a new apartment for the family. Gorry also testified that on January 12, 2010, Mother and D.H. were waiting for her at her office, saying they needed the rent money. Mother became upset because Gorry did not have it. Gorry testified that Mother had to be escorted from the lobby because she was angry and yelling. Gorry acknowledged, however, that losing an apartment can be upsetting but said that Mother's conduct was not appropriate because, in her opinion, Mother should not yell at the person trying to help her.

Gorry testified that Mother was not participating in MHMR services. Mother said she could not make her appointments, but Gorry testified that she had set it up so that the worker would go to Mother's house. Mother also told Gorry that she was not taking her medication. Gorry testified that she did not

8

believe that Mother was taking medications at any time between December 2009 and April 2010.

On January 22, 2010, Mother called Gorry and said that D.H. had left her and the children. Mother was very upset and crying, and she later told Gorry that there had been domestic violence between her and D.H. However, Gorry testified that D.H. had returned home by the next week.

In late-January, Mother was not at home when Gorry arrived to take her to a psychological evaluation. D.H. and Gorry made phone calls to try to find Mother, but they did not locate her.[5] D.H. told Gorry that he had lost his job because he had been having to stay home to care for the children. D.H. also told Gorry that Mother was not home a lot, that she went out at night and would not come back, that he did not know what to do about Mother, that he did not think she would get the help she needs, and that she was not staying off of drugs.[6] D.H. said that he did not know how much longer he could put up with Mother and that things were not getting better.[7] He told Gorry that Mother said she did not need medication.

By the end of February, Mother's in-home parenting services were discontinued because Mother had several no-shows. On March 5, Gorry had a

---

[5]Mother later told Gorry that she forgot about the psychological evaluation and was out looking for a job.

[6]However, Mother's drug tests near that time were negative.

[7]Mother told Gorry on January 28, 2010, that D.H. had moved out again.

telephone conversation with Mother during which Mother was yelling and cursing at someone else. Mother said that she was applying for a job at the apartment complex from which she had previously been evicted, that the manager told her to get off the phone, and that Mother became angry and yelled profanities about the manager. Gorry testified that L.L.F. was at the apartment complex with Mother during the incident.

Gorry testified that the Department increased the "severity level" of Mother's case on March 16, 2010. Mother had reported that D.H. had moved out and would not return, and the Department had received a new referral alleging that drugs were being sold from the home and that the children were being left alone while Mother used drugs. Mother told Gorry that she thought the referral came in because a woman had stolen movies from her and because she had gone to the woman's house and "busted up everything."

Gorry met with Mother the next day, and she testified that Mother's behavior was concerning. Mother reported having really big mood swings and said she wanted to call her MHMR worker to possibly take her medications again. Despite the drug allegation, Gorry testified that she had not seen Mother using or possessing drugs and agreed that the drug use allegations were all based on third-party reports. Even so, the Department staffed the case for a possible removal of the children.

Gorry testified that, on March 24, 2010, Mother's apartment had "dirty diapers, ashtrays on the floor, trash, [and] clothing everywhere." She testified

10

that Mother's apartment was always cluttered and dirty. Department investigator Melinda Esquibel was also present on March 24, and she described the condition of Mother's apartment as follows:

> There was -- when you went into the living room, there was a lot of blankets and clothing and just a bunch of various items all over the floors. Very, very cluttered. And, I mean, you could not walk through the living room without walking on something in there. There was some clothing laying all over the sofa and the chairs. The kitchen table was full of dishes and foods. In the bedrooms, there was one bedroom you couldn't even go in because it was so cluttered with clothing and furniture and toys.
>
> In the children's room, there was also trash on the floor, clothing, open empty containers -- peroxide -- and the restroom was cluttered with various items, too.

Esquibel also testified that a Mr. D., who was living with Mother and the children, admitted using marijuana and that Mother requested that he leave the home. Esquibel testified that the condition of Mother's home was the theme of her investigation but that she also had concerns about Mother's mental health issues. She said that during the March 24 visit, Mother went from "really nice and friendly, talking" to crying and that several times she moved her arm as if she would hit Gorry. Mother told Esquibel that she was not taking bipolar medication.

Esquibel also spoke with D.H., who told her that Mother "was a time bomb waiting to go off," that Mother was "oblivious to reality," and that he was concerned about Mother not taking her medication. D.H. said that Mother would call or text him just to start arguments. D.H. told Esquibel that he was concerned

11

for the safety of his children and that he supported whatever decision the Department made to keep them safe.

Gorry also visited Mother's apartment on March 31. Mother, Mr. D., T.L.F., K.D.B., and N.C.H. were present, and the condition of the apartment was a "slight improvement" from March 24. The Department sought removal of the children on April 1, and the trial court granted the Department's request.

Gorry talked with D.H. on April 2. He said that Mother and Mr. D. were using marijuana. He also said that living with Mother was torture, like being at war, and that she was "crazy." On April 5, Mother admitted to Gorry in a telephone conversation that she had used marijuana during her pregnancy but only when she was pregnant. Because the children had been removed, Mother's case was assigned to a different caseworker, and Gorry was no longer involved.

Abigail Flores served as Mother's caseworker from approximately May 2010 through trial. Mother's service plan required that she attend parenting classes and individual counseling, submit to a drug assessment, maintain stable housing and employment, and continue with her MHMR services. Flores testified that Mother had kept in touch with MHMR even though she had not always been compliant. Flores told Mother that she and the Department expected a higher level of MHMR participation than before, and Mother said she would take medication and work her services. Flores testified that Mother took advantage of visitation opportunities in May 2010.

12

Mother had a Medicaid card as of May 2010, but her Medicaid was terminated in June 2010 and later reinstated without a lapse in services. By June 2010, Mother had been dismissed from individual counseling by Catholic Charities but had again started counseling with Positive Influences.[8] However, Stacia Alexander, the executive director of Positive Influences, testified that Mother was subsequently discharged from Positive Influences because of missed appointments. Alexander also described an incident involving Mother during one of her counseling appointments. Alexander testified that she intervened in one of Mother's sessions after hearing elevated voices from another office. When Alexander arrived, Mother was agitated, upset, tearful, and irritable. Alexander agreed that clients become upset at times during counseling but testified that Mother's behavior was unusual.

Flores testified that Mother had ended her relationship with Mr. D. by June 2010, but Mother reported to Flores that she was still having financial stress. Mother had also been dropped from parenting classes by this time for non-attendance, and she told Flores that she had not attended because she had a lot going on.

Flores testified that Mother was trying to work her services in July 2010 but that her progress was minimal. Mother claimed that she could not reach Positive Influences and that they were not returning her calls. Flores testified that Mother

---

[8]Flores added that Mother had not benefitted from the counseling sessions she had attended before being discharged.

was compliant with MHMR other than medication management, attended her psychological assessment, and consistently attended visitations with the children. Mother did not submit to a drug assessment. Flores also testified that Mother attended three of twelve parenting class sessions and between four and six of twelve individual counseling sessions before being discharged for non-attendance. Mother had also not been employed, but Flores acknowledged that her recommendation that the court terminate Mother's parental rights would not change if Mother had been employed.

In September 2010, Mother told Flores that she was taking her medication. However, Mother lost her Medicaid again in October 2010, and it had not been reinstated as of the time of trial. Mother also told Flores about volatility within her own family. She was attacked by her brother on July 12, 2010, and August 30, 2010, and someone hit her with some keys on October 27, 2010. Flores testified that she saw an injury to Mother from one incident with her brother, and Flores described the injury as a gash on the side of Mother's neck, like a scratch, that extended from the back of her neck to the front. In November 2010, D.H. told Flores that Mother was "crazy"; he said "she was out of there and that she was a split personality and she flips."

Flores testified that Mother did well with the children at visitations and that Mother loves them. Flores said that it is hard to control the children because they are kind of hyper, but Mother was attentive to the children, tried to redirect them, and brought them food. However, Mother became very upset in front of

14

the children during one visitation. Flores testified that when Mother "gets upset, she gets really, really upset[,] and it takes a lot to really calm her down. She raises her voice[,] and she cries a lot." Flores testified that when she asked Mother if she was taking her medication, Mother answered, "What good would it do?"

Flores testified that Mother was incarcerated days before trial for missing a criminal court date. Mother had informed Flores of the charge a week or two earlier. Mother did not attend the court hearing because she was at a visitation with L.L.F.

Flores said that Mother was initially arrested for impeding a peace officer by standing between the officer and the suspect, and Mother gave Flores her version of what had occurred. Mother was at her parents' third-floor apartment, and they heard police activity on the bottom floor. Her brother went downstairs, and the police followed him back upstairs. Mother said she was trying to get her brother into the apartment to prevent him from going back to prison when the police came through the door and pushed everyone down. Flores testified that it was concerning to her that Mother was being accused of conduct consistent with an untreated bipolar condition.[9]

---

[9]On a March 29, 2011 document contained within Mother's jail records, Mother answered that she does not take medications. Trial in this case began on March 30, 2011.

Flores testified that, in her opinion, Mother cannot meet the minimal duties that parents owe to their children and that termination of Mother's parental rights to the children is in the children's best interest. Flores testified that the children need stability and do not need to be going back and forth between Mother and foster care and that Mother cannot provide that stability. Flores testified that the Department had educated Mother and given her the tools necessary to parent her children but that Mother still cannot provide the children with stability.

Flores testified that A.A.H. and N.C.H. are together in foster care and are doing well. She said that A.A.H. is "a handful," a little active, and very strong-willed. A.A.H. is attending speech therapy and is doing really well in the foster home. Flores testified that N.C.H. is a "happy-go-lucky baby"; she has only cried once, and only because she was sick. Flores said that N.C.H. is kind of sickly and deals with a lot of allergies and congestion, but she had tubes placed in her ears, which has helped. Flores also testified that the foster family is a potential adoption placement for the two girls if Mother's parental rights are terminated.

Flores also described T.L.F. and K.D.B. They are together in a different foster home because the Department could not find a foster home for all five children. Flores said that T.L.F. and K.D.B. are "pretty active kids[,] and they're hard to control when they're together because they are active." She testified that T.L.F. is doing really well and is very talkative; she gets in trouble at school for talking, but not for any other reasons. She is "really sweet," doing well in school, and is a dancer. Flores testified that T.L.F. offered to teach her "how to boogie."

K.D.B. is attending counseling in a full-day program and speech therapy, and he has improved a lot with his speech. Flores said that he "kind of sits back and he's always fighting for attention because he's the only boy, but he's also doing well." The children are all together at visitations.

Flores testified that all of the children other than N.C.H. attend counseling. T.L.F. is in counseling because "she sexually acts out where she will stand in front of the mirror and touch herself," because of the things she has reported seeing, including people yelling, and because of the separation from home. K.D.B. is in counseling because of his separation from home.

Flores testified that L.L.F. is in a residential treatment center (RTC), not a foster home, because she had to be removed from three different foster placements within a two-to-three month period. L.L.F. was removed from the first placement (with K.D.B. and T.L.F.) because she tried to control them and told them to do things that would get them in trouble. She also started hitting K.D.B. and T.L.F. and had to be watched closely before she was moved to another foster home. She was moved to a third foster home because of her behavior; she hit the foster parents' children and "was dragging them down the hallway and she ripped some curtains down from the wall and she was destroying property." L.L.F. has been in the RTC since January 2011 and has stayed at the same level through the time of trial. Flores testified that A.A.H.'s and N.C.H.'s foster family has stated a willingness to accept L.L.F. but that L.L.F. is not at a point where she can be integrated into the home.

17

Flores also testified that a home study of K.D.B.'s paternal grandmother was completed just before trial, but Flores did not know the result. If placement with K.D.B.'s paternal grandmother is approved, K.D.B. would be placed there, and T.L.F would go to the foster home where A.A.H. and N.C.H. live and where L.L.F. might eventually live after discharge from the RTC. Flores also described the services available to adoptive parents, regardless of who those adoptive parents may be.

D.H. testified that he is the father of A.A.H. and N.C.H.[10] He testified that he did not believe Mother attempted suicide in 2007, but he acknowledged learning at that time that Mother had emotional problems that required treatment. He testified that he saw Mother take her medication between August 2007 and the time when the children were returned to her, but he acknowledged seeing her mood swings. D.H. testified that Mother had exhibited these mood swings from 2007 to the present and said that he had seen Mother "bust out emotionally" and cry "quite a lot." D.H. reiterated that he thinks Mother took her medication when he was around, but he also acknowledged that, looking back, he believes Mother was probably not taking her medication. He also recalled her talking about the side-effects of the medication, such as headaches and vomiting.

---

[10]The trial court denied the Department's request that D.H.'s parental rights to A.A.H. and N.C.H. be terminated, finding that termination would not be in their best interest.

18

D.H. agreed that he had previously said living with Mother was like torture, testifying that she always wanted to argue. He also recalled his stated belief that Mother and Mr. D. were using marijuana in her apartment, and he testified that he smelled "stuff" in the house. D.H. testified that Mother denied using marijuana when he asked her about it, but he did not believe her. D.H. testified that he does not believe that Mother put bleach in his food.

D.H. described Mother as follows:

> [Mother] is a good woman. She just needs help. She's a good mother. She does need help, constructive help, and me being a father to those children, of all the children, you know, I do the best I can as a father, but when you go through these changes of emotion and mood swings and numerous of people [sic], [Department] workers know her moods. They read the papers. They know her history, you know. I needed their help. They knew what was going on. And one day, she's 100 percent, you know, working with me, and two hours later, it's a totally different person.
>
> She just needs help. She does need help.

D.H. testified that he does not want his children, A.A.H. and N.C.H., to go through the chaos and trouble that the older children have lived through with Mother. He testified that Mother is an appropriate parent but that it is not a good idea for the court to return the children to her.

Mother also testified. She acknowledged having not finished her service plan and said that she initially had transportation issues with Catholic Charities and had asked for and received a transfer to a closer location. She also admitted that she later stopped going without excuse. Mother testified that she attended the majority of her visitations; that she has a good relationship with the children;

19

that they ran to her, told her they love her, and asked when they are going home; and that during visitations, she and the children played together, talked about their daily routines, and interacted a lot.  Mother testified that she always brought the children food and that she had occasionally bought them toys to take home.

Mother testified that she was, at the time of trial, not currently taking her medications because she ran out a month earlier and had been taking her medication every three days so it would last until her Medicaid was reinstated.  Mother testified that her Medicaid became effective the same day of her testimony, and she said her previous Medicaid lapses were related to confusion over whether she was getting Medicare through Social Security.  Mother denied having told anyone that she was not taking her medication in the past, and she testified that she had only "stretched" her medications for the last month before trial.  She testified that the medication helps but that memory loss is a side-effect.

Mother testified that she receives $701 each month in social security income, and her rent is $495 per month.[11]  She supports herself by using money that she had saved from a tax refund, social security reimbursements, and past employment.  Mother testified that she has lived in the same one-bedroom apartment since August 2010 and that she had worked at Dollar General for four months of seasonal employment and at a temporary service job for a week.  She

---

[11]The actual amount of each monthly check is $604 per month because a premium is deducted monthly.  The premium is later reimbursed.

20

said she is looking for employment and has filled out a lot of applications. She also receives $165 in food stamps each month.

Mother testified that she would rent a two-bedroom apartment if the children were returned to her. Rent for that apartment would be $595, and Mother agreed that she would not have the money to pay for daycare for the children. She testified that she can work but not too much because it would affect her social security eligibility. She also testified that she has already purchased furniture for the children.

Mother denied needing governmental assistance to maintain stability; instead, she testified that she wanted to take advantage of what was offered to her by the Department. Specifically concerning the Department's rent payments on her behalf, she testified that she did not need the money and wished she had not asked Gorry for it because of how it had made her look in court. Mother denied yelling at Gorry about rent money but acknowledged being asked to leave for being "a little bit too loud." Also, Mother said that she did not ask Strengthening Families for money but was told there was money available to her for furniture.

Mother acknowledged that she became very emotional at a counseling session at Positive Influences, but she testified that she was upset because someone told her she would not get her children back since she had missed too many classes. Mother testified that she was not angry at the workers, that she was instead upset about having her parental rights terminated, and that she was

21

hyperventilating and coughing. She testified that she calmed down after Alexander explained the court process to her.

Mother lived with D.H. from early 2007 through February 2010, but she testified that he was in and out of her house. She denied putting bleach in D.H.'s food or ever telling anyone that she had done so. Mother denied having a violent relationship with D.H. and testified that she disagreed with D.H.'s testimony that living with her was torture. She testified that D.H. is a good father but that she has no plans to get back with him.

Mother acknowledged having clothes all over her house, but she testified that the children's diapers were in the trash; trash could have been overflowing a little, but she said her apartment was nothing like what other witnesses had described. Mother denied using marijuana or admitting to anyone that she had used marijuana, saying that she last used marijuana in 2007 and that she had never used marijuana while pregnant. Mother denied ever hearing voices or telling anyone that she had, and she also denied having attempted suicide in 2007. Mother testified that she took one Tramadol but felt nauseous, so she called an ambulance for herself. She also called her mother to come watch the children.

Mother agreed that she had difficulties between August 2007 and June 2009, and she described the difficulties as follows:

> I had just lost my job. That's how I ended up getting that aggravated assault thing, so I ended up losing my job, I ended up losing my apartment, my mom ended up dying, and I felt like, you know, I was

22

like depressed, I was crying, I was feeling like, you know, how can this happen, what is going on, you know, with me being pregnant and me defending myself from being attacked, so that's mainly what it was. And then [D.H.], he was cheating on me.

She testified that she now has her father and friends to support her when she needs it, even with paying bills. She said that Mr. D. was her boyfriend but that she had not seen him since September 2010.

Mother testified that she wants D.H. to have her children if she cannot have them but that she wants them back. She said that the children should be returned to her because she has never abused them, loves them, makes sure they get their education, takes care of them, and has a bond with them.

Mother testified that L.L.F. is doing structured activities every day at the RTC, receiving counseling, and going to school. She said that they are "help[ing] her be calm at what she does, because she has an attitude." However, Mother testified that L.L.F. did not start acting out until she was removed the second time, that she started withdrawing, and that she missed Mother. Mother testified that the children had structure when they lived with her.

Finally, Mother testified that she was arrested the day before trial began because she had missed a criminal court date while she was in Brownwood for a visitation with L.L.F., who she had not seen in two months. Mother testified that the issue had been resolved, and she expected to be released the day of her testimony because she had pleaded guilty and had been sentenced to community service and time served.

23

Dr. Parnell Ryan, a psychologist, conducted a psychological assessment of Mother in October 2007. In his assessment, Dr. Ryan noted that Mother admitted attempting suicide. She denied having auditory hallucinations, but she told Dr. Ryan that she had been diagnosed with ADHD, depression, bipolar disorder, and an anxiety disorder and that she was not taking medication at the time. Mother said that she had overdosed at age thirteen and had been prescribed psychotropic medication from age fifteen forward. Mother also informed Dr. Ryan of past physical altercations between her and the father of two of her children. Mother admitted past drug use, specifically marijuana, and said she had two convictions for assaultive offenses.

Dr. Ryan testified that, on the Kaufman Brief Intelligence Test, Mother scored in the borderline range of intellectual functioning. She demonstrated elementary-school-level comprehension on each element of an academic functioning test. For Mother's emotional functioning, Dr. Ryan testified that his diagnostic impressions were that Mother has a bipolar disorder and cannibas dependence. Dr. Ryan also testified that Mother has "Personality Disorder Not Otherwise Specified," which means that she has "antisocial dependent traits" that could become a "full-blown" personality disorder if she did not take the time to treat herself. Dr. Ryan testified that Mother's disorders are treatable but that they require honesty and "a great deal of work." When asked to give his outlook for Mother after being informed that she had continued to not take her medication and to have anger and explosive behaviors two and one-half years later, Dr.

24

Ryan testified that his prognosis would change from "favorably-guarded" to "poor."

Dr. Amy Fisher-Smith, a licensed clinical psychologist, conducted a psychological evaluation of Mother in June 2010. She asked Mother to complete a personality assessment and a parental stress index, and she obtained a family and social history. Dr. Fisher-Smith testified that she noticed that Mother's emotions were "kind of all over the place. She would have crying spells and then she would have a more stable mood and then she would become irritable, and then maybe a little euphoric." Mother said to her, "I hate myself. What did I do? All I want is love, and I can't get it from nobody. I hate men, and I like being alone."

Dr. Fisher-Smith testified that she assessed Mother as having Bipolar One Disorder and Post-Traumatic Stress Disorder, and she included a rule-out diagnosis of Generalized Anxiety Disorder. Dr. Fisher-Smith also testified that she assessed Mother with having borderline personality disorder and a need to rule out antisocial personality disorder. She testified that Mother's bipolar disorder can be managed with medication and therapy and that although there are treatments for antisocial disorder that can be effective, treatment is more complicated. Dr. Fisher-Smith explained that Mother's case is particularly complex because she has both bipolar and antisocial diagnoses, which makes treatment more difficult.

25

Dr. Fisher-Smith described Mother as mildly- to moderately-impaired in terms of making parental decisions, and she testified that the failure to follow and receive treatment puts Mother more on the moderate end of parental impairment. She testified that parenting five children would be inherently more difficult for anyone but especially so for Mother and that Mother definitely cannot parent during depressive episodes. Dr. Fisher-Smith testified that the future prognosis for a person with a bipolar condition depends on what the person has or has not proven they can or will do for medication management and therapeutic intervention.

### III. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v.*

*Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the

28

child.  Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

## IV.  Statutory Endangerment

Mother argues in her first and second issues that the evidence is legally and factually insufficient to support the trial court's section 161.001(1)(D) and (E) findings.

## A.  Applicable Law

"Endanger" means to expose to loss or injury, to jeopardize.  *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).  Under section 161.001(1)(D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being.  *J.T.G.*, 121 S.W.3d at 125.  Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.  *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.  *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

29

Parental and caregiver illegal drug use and drug-related criminal activity likewise support the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.,* 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.,* 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.,* 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd,* 727 S.W.2d at 533; *J.T.G.,* 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re R.W.,* 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

"To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth." *In re M.E.-M.N.,* 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citing *In re D.M.,* 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)). A parent's mental state may be considered in determining whether a child is endangered if

that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ). Further, threats or attempts to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being. *See In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.).

## B. Discussion

Mother argues that there is insufficient evidence that any of her conduct impacted the children. Concerning her failure to take medication, Mother argues that she was pregnant during one period in which she did not take medication, that she was otherwise unable to maintain her medication because of lapses in her Medicaid and Medicare coverage, and that she therefore attempted to "stretch" her medication to make it last longer. She argues that there is no link between her cluttered home and any endangerment to the children, and she points to conflicting evidence about the alleged bleach incident and her angry outbursts. Mother also argues that although the Department relies on evidence concerning her aggressive and volatile behavior to support the trial court's endangerment findings, the Department did not remove the children from her care when the incidents allegedly happened. Finally, Mother argues that she made "great efforts" to comply with her service plan.

31

The Department responds that there is ample evidence that Mother endangered the children, and it points to evidence that Mother took pills and asked L.L.F. to help her commit suicide, that Mother refused to take her bipolar medication, that living with Mother (given her largely untreated mental illness) was chaotic and like torture, that Mother used marijuana during her two most recent pregnancies, that Mother used marijuana in the home where the children lived, that Mother's relationships involved domestic violence, and that Mother did not complete her service plan.

This court has held that a parent's failure to take medication can create an environment or expose a child to an environment that endangers the child's emotional or physical well-being. *See In re M.A.P.*, No. 02-11-00484-CV, 2012 WL 2036457, at *10 (Tex. App.—Fort Worth June 7, 2012, no pet. h.) (mem. op.) (holding the mother's failure to take medication for schizophrenia after birth of child given the mother's past conduct without medication was sufficient for trial court to conclude that the mother endangered the child); *see also In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) ("[T]he trial court could have chosen to believe that Mother's . . . failure to . . . take steps to treat her mental health issues demonstrated an inability to provide [the child] with a safe environment."); *In re O.E.W.-K.*, No. 02-10-00199-CV, 2011 WL 1225470, at *28 (Tex. App.—Fort Worth Mar. 31, 2011, no pet.) (mem. op.) (citing *Sawyer v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00286-CV, 2003 WL 549216, at *8 (Tex. App.—Austin Feb. 27, 2003, no pet.) (mem. op.) (stating that

the appellant's refusal of treatment for her mental illness endangered her children)).

In addition to the evidence concerning Mother's failure to take her bipolar medication, the trial court heard testimony concerning Mother's guarded long-term prognosis without medication, drug use while pregnant, drug use in the home, aggressive behavior, and criminal convictions. While the evidence is in many respects conflicting, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See In re C.S.L.E.H.*, No. 02-10-00475-CV, 2011 WL 3795226, at *5 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.); *see also In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) ("[T]he fact finder, as opposed to the reviewing body, enjoys the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness.").

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's findings that Mother engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered the physical or emotional well-being of the children and knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *see also H.R.M.*, 209

33

S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. We thus overrule Mother's first and second issues.[12]

## V. Best Interest

Mother argues in her fourth issue that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

---

[12]Because we have overruled Mother's first and second issues, we need not address her third issue. *See In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.— Fort Worth 2007, no pet.); *see also* Tex. R. App. P. 47.1.

(E)　　the programs available to assist these individuals to promote the best interest of the child;

(F)　　the plans for the child by these individuals or by the agency seeking custody;

(G)　　the stability of the home or proposed placement;

(H)　　the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)　　any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Discussion

The evidence is discussed in detail above, and we do not repeat it here. Applying the *Holley* factors, we note that Mother regularly attended visitations, that Mother and the children interacted well during visitations, and that Mother feels bonded to the children. The four youngest children are doing well in foster care, but L.L.F. is in an RTC because of her behavior. Mother testified that L.L.F. did not act out in her home, but T.L.F. and A.A.H. are both in counseling for

35

acting out sexually. T.L.F. had also reported that "she's always seen people yelling." D.H. testified that Mother is a good mother, but he also testified that she needs help, that he does not want his daughters A.A.H. and N.C.H. to experience the difficulties that Mother's older children experienced while living with Mother, and that it is not a good idea for the court to return the children to her. The trial court heard evidence that Mother attempted suicide, that she is hostile and aggressive without her medication, and that she does not believe she needs her medication and has not taken advantage of the medication management offered through MHMR. Mother also used marijuana during two pregnancies and in the home and failed to complete her service plan.

Applying the appropriate standard of review, we hold that the evidence is factually sufficient to support the trial court's best interest finding. *See H.R.M.*, 209 S.W.3d at 108; *see also In re S.A.G.*, No. 02-09-00125-CV, 2010 WL 1006301, at *9 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op) (discussing mother's mental health issues in best interest context); *In re K.W.*, No. 02-08-00162-CV, 2009 WL 417913, at *6 (Tex. App.—Fort Worth Feb. 19, 2009, no pet.) (mem. op.) ("Despite Appellant's bipolar diagnosis, she did not take medication and had not sought treatment from a mental health expert. This evidence also tended to show a potential emotional and physical danger to the children."); *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *11–12 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (holding that mother's "instances of mental instability and agitation, including threatening

behavior and suicidal ideation" supported termination); *In re K.A.S.*, 131 S.W.3d 215, 226 (Tex. App.—Fort Worth 2004, pet. denied) (discussing the emotional and physical danger of the mother's noncompliance in taking medications for her bipolar disorder). We thus overrule Mother's fourth issue.

## VI. Conclusion

Having overruled Mother's dispositive issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

DELIVERED: July 19, 2012